**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | |
|---|---|
| IN RE: | C/A No. 14-07268-5-DRD |
| Celeste G. Broughton, | Chapter 7 |
| | **ORDER** |
| Debtor. | |

This matter is before the Court on the following: (1) Application for Compensation for Walter L. Hinson, attorney for the trustee [Docket No. 534]; (2) Application for Compensation for Walter L. Hinson, chapter 7 trustee [Docket No. 536]; (3) Motion to Disqualify Judge David Duncan filed by the debtor Celeste Broughton [Docket No. 543]; (4) Objection to Payment of a Claim to Charles Pace and an amendment to the objection filed by Mrs. Broughton [Docket No. 545 and 548]; and (5) Objection to Claim of Aldridge for Payment and an amendment to the objection filed by Mrs. Broughton [Docket No. 546 and 549]. The Court held a hearing on all matters on August 5, 2020. At the conclusion of the hearing, the Court ruled on all matters. The Court now issues this order.

## BACKGROUND

This bankruptcy case follows years of domestic litigation between Mrs. Broughton and her ex-husband, Robert B. Broughton, that began in the early 1970s and led to litigation with his probate estate. In connection with the parties' divorce, Mr. Broughton deeded real property located at 2529 White Oak Road, Raleigh, North Carolina (the "Property") to Mrs. Broughton. After Mr. Broughton died in 2007, Mrs. Broughton became involved in litigation with his estate and Wells Fargo Bank ("Wells Fargo"), the co-executor of his estate, seeking increased alimony.

Due to Mrs. Broughton's tactics in the estate litigation, including filing frivolous pleadings and violating court orders, the state court entered a total of eight judgments for sanctions against Mrs. Broughton. Mrs. Broughton borrowed money secured by liens on the Property to pay some of the judgments. Mrs. Broughton was unable to pay the final two judgments, and filed her bankruptcy case the day prior to a scheduled execution sale of the Property.

Mrs. Broughton's bankruptcy case has proceeded in largely the same fashion as the state court litigation. The case has lasted nearly six years. The docket in the bankruptcy case currently contains 561 entries. Additionally, while the case was pending in the United States District Court for the Eastern District of North Carolina after withdrawal of the reference, over 200 entries were entered on the District Court docket. There have been adversary proceedings, civil litigation, and appeals. Including the undersigned, nine judges have been assigned to the bankruptcy case. Mrs. Broughton has filed ten appeals, often appealing numerous orders at one time.

Mrs. Broughton, who has represented herself throughout this case, originally filed her chapter 13 bankruptcy petition on December 15, 2014. Her case was converted to one under chapter 7 on July 14, 2015 and Mr. Hinson was appointed as the chapter 7 trustee. On August 6, 2015, Mr. Hinson filed a motion to sell the Property free and clear of liens. Over the course of the next five years, Mrs. Broughton vehemently fought the sale of the Property. Mrs. Broughton's arguments focus almost solely on the dispute with her ex-husband, his estate, Wells Fargo, and the attorneys involved. Mrs. Broughton's main argument, repeated innumerable times throughout this case, is that these parties, along with the trustee and the judges assigned to her bankruptcy case, engaged in a conspiracy to deprive her of the Property. Mrs. Broughton has advanced a variety of additional arguments to retain the Property, including that the Property was

2

fully exempt pursuant to bankruptcy statutes relating to domestic support obligations, that orders entered by the judges in this case are void ab initio due to fraud, and often, that she did not receive notice of hearings or service of pleadings. She also engaged in extrajudicial efforts, such as reentering the Property, despite orders requiring her to vacate and remain away from the Property, posting no trespassing signs on the Property, and contacting potential purchasers of the Property to discourage them from purchasing. Those efforts resulted in two different judges finding Mrs. Broughton in civil contempt and ordering her into the custody of the United States Marshal. In the latter instance, due to her repeated violations of court orders and her refusal to agree to comply with court orders, Mrs. Broughton was incarcerated for a period of approximately a month and a half. As a result of her continuous frivolous and inflammatory filings and her relentless interference with Mr. Hinson's attempts to sell the Property, the Court also imposed a prefiling injunction, barring Mrs. Broughton from filing any documents relating to the Property, the sale of the Property, or any other matters regarding the trustee and his professionals or the purchasers of the Property, unless she obtained prior authorization from the Court. [Docket No. 466].

This Court was not the first to impose a prefiling injunction on Mrs. Broughton. In September 2009, Wake County Chief District Court Judge Rader issued an order prohibiting Mrs. Broughton from filing documents relating to her domestic litigation. That order was later expanded by Superior Court Judge Titus due to continued filings by Mrs. Broughton in violation of Judge Rader's order. United States District Court Judge Margaret B. Seymour also imposed a prefiling injunction in *Broughton v. Gregory* on October 21, 2019. [District Court Case No. 5:19-cv-00066-S, Docket No. 23].

Ultimately, Mrs. Broughton's attempts to undermine the efforts of the trustee in her bankruptcy case were unsuccessful. Mr. Hinson obtained a contract for the sale of the Property for $2.1 million dollars—an amount sufficient to pay all creditors and provide a significant surplus in excess of $315,000.00 to Mrs. Broughton. The sale of the Property was completed in October 2019. Mr. Hinson filed his final report and his applications for compensation on June 18, 2020. The Court's rulings on the matters heard at the August 5 hearings are set forth below.

## ANALYSIS

1. Motion to Disqualify Judge David Duncan

The Honorable Margaret B. Seymour was assigned to this case on April 9, 2019. The undersigned was designated to hold bankruptcy court in the Eastern District of North Carolina by the Fourth Circuit on April 17, 2019. [Docket No. 402]. Judge Seymour then vacated the withdrawal of reference and referred the case to the undersigned on May 6, 2019. [Docket No. 399]. Mrs. Broughton filed her motion to disqualify the undersigned on June 29, 2020. The motion states that the undersigned is involved in a criminal conspiracy with other judges, creditors, and the trustee. The motion details various crimes Mrs. Broughton alleges the undersigned has committed in connection with her case, and concludes that as a result of these crimes, the undersigned should be disqualified. Additionally, Mrs. Broughton complains of the time she spent incarcerated and the inhumane conditions she claims to have endured during the incarceration, following a finding of civil contempt.

This is not the first request for disqualification of the undersigned made by Mrs. Broughton. On June 14, 2019, Mrs. Broughton filed a document entitled "Motion for Judge Duncan to Obey 28 USC 455(a)." [Docket No. 428]. That document contained a lengthy recitation of Mrs. Broughton's allegations of criminal activity by United States District Judge

4

Reidinger in connection with her case and goes on to state that Judge Duncan's perspective on the case is "exactly that of Reidinger" and that Judge Duncan is "intellectually a virtual twin of Reidinger in his relevant attitudes to the issues of this case." The June 14 motion states that the undersigned has an appearance of partiality and that he is required to recuse himself. On June 26, 2019, after a hearing on the matter held June 21, 2019, the Court issued an order denying the motion. [Docket No. 443]. The Court detailed the allegations made in Mrs. Broughton's motion and then stated:

> Debtor has provided this Court with no evidence in her Motion or at the hearing on June 21, 2019 that Judge Duncan is partial, in this matter or otherwise. Furthermore, as Judge Duncan confirmed on the record at the hearing, he is not partial in this matter in any way. Thus, there is no basis for Judge Duncan to disqualify himself. Accordingly, Debtor's Motion is denied.

Order, Docket No. 443.

Mrs. Broughton filed a second motion to disqualify Judge Duncan on August 28, 2019. [Docket No. 464]. The second motion repeated the same arguments made in the first regarding Judge Reidinger and the undersigned and states (in a heading), "28 USC 455(a) Provides That Judge Duncan Is Depriving cb[1] Of Due Process By His Refusal To Recognize His Appearance Of Partiality Toward Reidinger." Again, the Court held a hearing on the request on August 30, 2019. At the hearing, the Court denied the motion. The Court then entered an order on September 4, 2019, stating:

> Here, there is no basis for disqualification. Despite Mrs. Broughton's assertions otherwise, there is no reasonable basis for questioning Judge Duncan's impartiality. Judge Duncan has no personal relationship with any of the previous Judges that have been assigned to the case, with the trustee, or any of the other interested parties. Additionally, Judge Duncan has no knowledge acquired from any source other than his participation in the case, and therefore has no bias deriving from an extra-judicial source. Mrs. Broughton articulated no basis for recusal. Accordingly, her motion to disqualify Judge Duncan was denied.

---

[1] The debtor frequently refers to herself as "cb" in pleadings.

Order Denying Motion for Appointment of Attorney & Motion for Disqualification of Judge Duncan, Docket No. 471.

Mrs. Broughton next filed a "Motion for Duncan to Acknowledge His Disqualification" on November 18, 2019. [Docket No. 502]. That motion again demanded that the undersigned recuse himself due to his partiality in the case and also accuses the undersigned of fraud. The Court entered an order denying that motion on December 2, 2019. [Docket No. 507]. The Court again found that there was no "reasonable basis for questioning Judge Duncan's impartiality."

Mrs. Broughton's fourth motion to disqualify Judge Duncan, filed on June 29, 2020, reiterates the arguments she has repeatedly made throughout her bankruptcy case, both in her three previous motions to disqualify and in numerous other pleadings and documents she has filed. She asserts the undersigned has engaged in a variety of criminal actions in her case and argues that disqualification is necessary so that "some judge [can] be appointed who honors the rules of court."

As the Court has stated in its previous orders, 28 U.S.C. § 455 requires that a judge disqualify himself in any proceeding in which his impartiality may reasonably be questioned. "The inquiry is whether a reasonable person would have a reasonable basis for questioning the judge's impartiality, not whether the judge is in fact impartial." *In re Beard*, 811 F.2d 818, 827 (4th Cir. 1987). The Fourth Circuit has also stated:

> The alleged bias must derive from an extra-judicial source. It must result in an opinion on the merits on a basis other than that learned by the judge from his participation in the matter. The nature of the judge's bias must be personal and not judicial.

*Id.* (internal citations omitted). A motion to recuse a judge "may not be predicated on the judge's rulings in the instant case or in related cases, nor on a demonstrated tendency to rule any particular way, nor on a particular judicial leaning or attitude derived from his or her experience

on the bench." *Lindsey v. City of Beaufort*, 911 F. Supp. 962, 967-68 (D.S.C. 1995) (citing *United States v. Grinnell Corp.*, 384 U.S. 563 (1966); *Berger v. United States*, 255 U.S. 22, 31 (1921)). "A presiding judge is not . . . required to recuse himself simply because of 'unsupported, irrational or highly tenuous speculation.'" *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003) (quoting *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998)).

Mrs. Broughton alleges that any person with any sense would find that the undersigned is partial in this matter. However, that is simply not the case. The undersigned had no knowledge of this case prior to the case being assigned to him and has no knowledge other than that obtained from the docket in the bankruptcy cases and the various related cases and his presiding over the case. The undersigned has no personal relationship with any party, attorney, or judge involved. The actions taken by the undersigned as the judge assigned to this case reflect simply a fulfillment of the duties and responsibilities of a bankruptcy judge. One of the primary actions of which Mrs. Broughton complains, her incarceration prior to the completion of the sale of the Property, was the result not of any partiality or prejudice against her, but the result of her repeated refusal to abide by orders of the Court and her repeated efforts to interfere with the trustee's sale of the Property—a sale that was being completed in furtherance of the trustee's statutory duties. The Court has shown no partiality, and no reasonable person could find there is an appearance of partiality here.

Mrs. Broughton complained at the hearing on her motion that the undersigned is the only judge who has failed to recuse himself after her request. However, this is not the standard for disqualification or recusal. *See Woltz v. United States*, 2010 WL 330218, at *1 (W.D.N.C. Jan. 20, 2010) (quoting *In re Mann*, 229 F.3d 657, 658 (7th Cir. 2000)) (stating, in the context of judicial misconduct complaints, "With respect to a litigant having filed a complaint of judicial

7

misconduct against the presiding judge, bias or impartiality cannot be inferred simply from that fact. 'Indeed, if that were the rule, litigants displeased with Judge A's adverse rulings could easily manipulate the system by filing a misconduct complaint, thereby disqualifying Judge A from hearing the case, in the hopes that the case would then be assigned to Judge B who might be more sympathetic to their cause.'"). The fact that other judges previously assigned to her bankruptcy case recused themselves for whatever good reasons they may have had has nothing to do with the undersigned's responsibility to recuse himself. It would be an abdication of the Court's responsibilities to adjudicate and complete this bankruptcy case if the undersigned recused himself simply because Mrs. Broughton asked.

Mrs. Broughton has a long history of requesting disqualification of judges. In *Broughton v. Gregory*, 2019 WL 3851613, at *3-6 (E.D.N.C. Aug. 15, 2019), United States District Judge Seymour detailed some of these various requests regarding federal judges. The disqualification requests discussed by Judge Seymour include all Fourth Circuit judges, four District Court judges, and two bankruptcy judges. Mrs. Broughton states in her motion to disqualify that the undersigned will "likely attempt to evade responsibility" by citing this case. However, it is not clear how citation to this case would allow the undersigned to "evade responsibility." What is clear, is that Mrs. Broughton's overarching strategy is to seek disqualification of any judge who does not rule in her favor. Mrs. Broughton's fourth motion for disqualification is denied.

2. Objection to Payment of a Claim to Charles Pace

Charles T. Pace filed a claim in Mrs. Broughton's bankruptcy case on May 12, 2015. The claim is unsecured in the amount of $53,280.00. The claim indicates that it is for a loan given to Mrs. Broughton in the original amount of $36,000.00. On October 13, 2015, Mrs. Broughton filed an objection to Mr. Pace's claim. [Docket No. 261]. The Honorable Catharine

Aron held a hearing on January 14, 2016. On March 1, 2016, Judge Aron entered an order overruling Mrs. Broughton's objection to claim. [Docket No. 359]. In the March 1 order, Judge Aron found that despite Mrs. Broughton's assertion that she did not receive notice of the hearing, she did receive proper notice of the hearing. Judge Aron stated that the testimony of Mrs. Broughton and Dr. Pace was conflicting, but found that the testimony of Dr. Pace was more credible. Judge Aron found that Dr. Pace established the validity of his claim by a preponderance of the evidence. Judge Aron allowed Dr. Pace's claim as unsecured, in the amount of $36,000.00, plus interest, accruing at the rate of 4%, from November 30, 2000 to the petition date. Because this is a surplus case, Dr. Pace will also receive statutory post-petition interest.

Mrs. Broughton filed a document entitled "Objections and 9023 Motion" on March 14, 2016. [Docket No. 365]. In the document, Mrs. Broughton asserts a number of reasons why Judge Aron's March 1 order was incorrect. She filed a supplement to her document on March 17, 2016, asserting additional arguments as to why her objection to Dr. Pace's claim should be sustained. [Docket No. 367]. Judge Aron treated the document as a motion to set aside the order and found that there was no "intervening change in controlling law, new evidence, or other circumstance indicating to the Court that it needs to amend the order to correct a clear error of law or prevent a manifest injustice." Accordingly, Judge Aron denied the motion to set aside. [Docket No. 369]. Mrs. Broughton did not file an appeal; thus, the orders entered by Judge Aron became final orders and the claim of Dr. Pace was allowed.

Mrs. Broughton filed another objection to the claim of Charles Pace on July 13, 2020 and amended her objection on July 14, 2020. The objection states that Mrs. Broughton "very recently" saw the claim of Dr. Pace but goes on to explain that a hearing had been held regarding

the claim and states that Dr. Pace failed to present any document establishing that she owed

money to Dr. Pace. Both the Bankruptcy Administrator and Dr. Pace filed responses to Mrs.

Broughton's objection. The Court issued a notice of hearing on July 16, 2020, setting a hearing

on Mrs. Broughton's objection on August 5, 2020. The notice of hearing was sent to Mrs.

Broughton on July 18, 2020. [Docket No. 551].

At the August 5 hearing, Mrs. Broughton stated that she did not receive notice that the

objection would be heard on that date and requested a continuance. However, the notice of

hearing issued on July 16 clearly stated that a hearing would be held on Mrs. Broughton's

amended objection to claim on August 5, and the certificate of service for the notice of hearing

reflects service on Mrs. Broughton at her address on record with the Court. [Docket Nos. 550,

551]. Proper notice of the hearing was given. The Court also notes that Mrs. Broughton has

asserted this argument on various occasions, in both state and federal court, to attempt to delay

proceedings. This is simply another tactic used by Mrs. Broughton in her vexatious efforts to

drag out various court proceedings.[2]

The Court will construe Mrs. Broughton's recently filed objection to the claim as a

motion to reconsider under Federal Rule of Bankruptcy Procedure 3008. Rule 3008 states, "A

party in interest may move for reconsideration of an order allowing or disallowing a claim

against the estate. The court after a hearing on notice shall enter an appropriate order." 11

U.S.C. § 502(j) allows reconsideration of a claim, stating "A claim that has been allowed or

disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed

according to the equities of the case." "A determination of the presence or absence of cause is

within the 'sound discretion' of the court." *In re Cassell*, 206 B.R. 853, 856 (Bankr. W.D. Va.

---

[2] *See* District Court Case No. 15-00053-5-JNC, Docket No. 11, Exhibit 1, pg. 3; Bankruptcy Case, Docket No. 359.

1997) (citing *In the Matter of Fox*, 64 B.R. 148, 152 (Bankr. N.D. Ohio 1986)). "The 'cause' standard of § 502(j) is not identical to the more stringent 'excusable neglect' standard of Fed. R. Civ. P. 60(b). Nevertheless, the factors considered in an excusable neglect analysis 'are likely applicable to a cause analysis.'" *Cassell*, 206 B.R. at 856 (citing *Cassell v. Shawsville Farm Supply, Inc.*, 1996 WL 885793 (W.D. Va. May 16, 1996)) (internal citations omitted). Factors to be considered in an excusable neglect analysis include:

> (1) the danger of prejudice to the [non-movant],
> (2) the length of delay and its potential impact on judicial proceedings,
> (3) the reason for the delay, including whether it was within the reasonable control of the movant, and
> (4) whether the movant acted in good faith.

*Cronin v. Henderson*, 209 F.R.D. 370, 371 (D. Md. 2002) (quoting *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380 (1993)).

In addition to considering the excuseable neglect factors above, the Court has considered all the facts and circumstances in this case to determine whether any cause exists to reconsider the allowance of Dr. Pace's claim. Because Mrs. Broughton did not appeal Judge Aron's order overruling her objection and allowing Dr. Pace's claim, or Judge Aron's order denying her motion to set aside that order, those orders became final orders. Mrs. Broughton presented no evidence tending to establish cause for reconsideration. Judge Aron's orders were entered in early 2016—over four years ago. Mrs. Broughton's bankruptcy case is at its conclusion and will be closed shortly after this order becomes final. Mrs. Broughton represented to the Court at the August 5 hearing that she did not see Judge Aron's order overruling her objection and allowing the claim until very recently, which caused her failure to appeal the order. She stated that her "Objections and 9023 Motion," filed after the entry of Judge Aron's order and challenging Judge Aron's ruling, was based on solely on the Court's oral ruling at the hearing on her original

11

objection to claim. However, at the conclusion of that hearing Judge Aron did not make an oral ruling, but took the matter under advisement. Further, it is clear from a review of the "Objections and 9023 Motion" that Mrs. Broughton was in fact referencing Judge Aron's written order overruling her objection to claim. That document references the date of the order (March 1), not the date of the hearing on the objection to claim (January 14). It also contains specific quotations from Judge Aron's March 1 order, including that "Debtor gave inconsistent answers" on examination and that the fact Mrs. Broughton did not file a gift tax return for the money received from Dr. Pace "affects the debtor's credibility." It is clear from a review of Mrs. Broughton's "Objections and 9023 Motion" that she received and reviewed Judge Aron's March 1 order overruling her objection to claim and filed the "Objection and 9023 Motion" in response. Judge Aron's order overruling the objection to claim is a final order. Dr. Pace's claim is allowed as unsecured in the amount of $36,000, plus interest, accrued at the rate of 4% per annum, from November 30, 2000 to the petition date and, as a claim in a surplus case, with statutory interest from the petition date until paid.

### 3. Objection to Claim of Aldridge for Payment

Mrs. Broughton's objection to claim filed July 13, 2020 indicates that the objection is to the claim of Sidney Aldridge; however, the claim to which she objects is actually the claim of the Estate of Robert Broughton (the "Estate"). Mr. Aldridge is the attorney of record for the Estate. Thus, the Court will refer to the claim to which Mrs. Broughton objects as the Estate's claim.

The Estate's claim was filed on February 18, 2015. The claim is secured in the amount of $47,941.14. The basis of the claim are two judgments for sanctions entered against Mrs. Broughton by the Wake County, North Carolina court. The first judgment was entered on November 6, 2012 and as of December 15, 2014, the balance on it was $40,700.62, plus per

diem of $7.6340. The second judgment was entered on June 27, 2014 and as of December 15, 2014, the balance on it was $7,240.52, plus per diem of $1.5296.

Mrs. Broughton filed an objection to the Estate's claim on May 20, 2015. [Docket No. 97]. The objection stated that the judgments that formed the basis of the claim were void ab initio due to the continuation of the case after Mr. Broughton's death. The objection also details purported misconduct by John McClain, the former attorney for the Estate. The Estate filed a response to the objection on June 1, 2015. [Docket No. 105]. A hearing was held on the objection to claim on July 13, 2015. Judge Benjamin Kahn entered an order overruling the objection to claim on July 14, 2015. [Docket No. 138]. Judge Kahn considered Mrs. Broughton's bases for objecting to the Estate's claim and ultimately found that he lacked subject matter jurisdiction to review the state court judgments. Judge Kahn stated, in response to Mrs. Broughton's argument that the state court judgments were void ab initio:

> The Rooker-Feldman doctrine applies even where the losing litigant in the state court asserts that the judgments are void ab initio due to the underlying errors committed by the state court or constitutional infirmities.

Judge Kahn further found that even if the court's jurisdiction was not limited by Rooker-Feldman, "the Debtor's challenges to the State Judgments further would be barred by 28 U.S.C. § 1738, which requires that this Court give full faith and credit to state court judgments to the same extent that such judgments would be given preclusive effect in the state courts. The State Judgments were full, final judgments, and are res judicata." Judge Kahn therefore allowed the Estate's claim as secured in the amount of $47,941.13.

Mrs. Broughton filed a motion to reconsider the order allowing the Estate's claim on July 23, 2015. [Docket No. 158]. The motion argues that the judgments were obtained through fraud and that Rooker-Feldman does not apply in that circumstance. The motion also discusses

collateral estoppel and states that the judgments cannot have collateral estoppel effect because Mrs. Broughton states that she did not have notice of a state court hearing where "the issue might have been purportedly litigated" and because of the fraud that occurred in connection with obtaining the judgments. The Estate filed a response to the motion to reconsider on August 7, 2015. [Docket No. 173]. The case was transferred to Judge Aron, and she entered an order denying the motion to reconsider on August 21, 2015 based on the Rooker-Feldman doctrine. [Docket No. 187].

Mrs. Broughton filed a notice of appeal of the orders overruling her objection to claim, denying her motion to reconsider, and other matters on September 4, 2015. [Docket No. 207]. The notice of appeal sought to appeal directly to the Fourth Circuit. Judge Aron entered an order on September 10, 2015, denying Mrs. Broughton's request to appeal directly to the Fourth Circuit and sending the appeal to the United States District Court for the Eastern District of North Carolina. [Docket No. 217]. After numerous filings by Mrs. Broughton in the appeal, United States District Court Judge Boyle entered an order affirming the bankruptcy court orders on November 18, 2016. [District Court Case No. 5:15-cv-575-BO, Docket No. 48]. Judge Boyle considered the order overruling the objection to claim to be the primary subject of the appeal and found that there was no error in the bankruptcy court's finding that Rooker-Feldman prevented the court from examining the state court judgments. Mrs. Broughton then filed a "Motion for Negation of the Untruthful Order entered November 18, 2016" and a Motion for a New Hearing. [District Court Case No. 5:15-cv-575-BO, Docket Nos. 51 and 53]. Judge Boyle entered an order denying those motions on April 24, 2017, finding no basis for reconsideration of his order affirming the bankruptcy court. [District Court Case No. 5:15-cv-575-BO, Docket No. 55]. No further pleadings were filed in connection with the appeal.

14

Mrs. Broughton filed another objection to the Estate's claim on July 13, 2020 and amended her objection on July 14, 2020. [Docket Nos. 546 and 549]. In her objection, Mrs. Broughton states that she presented evidence at the hearing on her original objection to the Estate's claim establishing that the judgments were void ab initio. She mischaracterizes Judge Kahn's order overruling the objection to claim, stating, "Judge Kahn's order listed all the fraudulent factors that the evidence showed had invalidated the judgment, rending it void ab initio." She incorrectly states that the order was not appealed. Both the Bankruptcy Administrator and the Estate filed responses in opposition to the objection to claim.

The Court sent out a notice of hearing clearly stating that it would consider Mrs. Broughton's objection to the Estate's claim on August 5, 2020. [Docket No. 550]. The docket reflects that the notice of hearing was mailed to Mrs. Broughton at her address of record. [Docket No. 551]. Despite this, as with her objection to Dr. Pace's claim, Mrs. Broughton complained that she did not receive notice of the hearing and asked for a continuance because she was not prepared to argue her objection to claim. However, it is clear from the record that notice of the Court's intent to hear the objection to the Estate's claim on August 5 was sent to Mrs. Broughton.

As with Mrs. Broughton's objection to Dr. Pace's claim, the Court will construe Mrs. Broughton's recently filed objection to the claim as a motion to reconsider under Federal Rule of Bankruptcy Procedure 3008, discussed above. As with Dr. Pace's claim, the Court has considered the excuseable neglect factors set forth above, as well as all facts and circumstances of the case. Again, Mrs. Broughton has established no cause and asserted no basis for reconsideration of the allowance of the Estate's claim. Her objection incorrectly characterizes Judge Kahn's findings. Despite Mrs. Broughton's assertion otherwise, she did appeal Judge

15

Kahn's order overruling the objection to claim, and her appeal was unsuccessful. Judge Boyle affirmed Judge Kahn's order and Mrs. Broughton did not pursue the appeal further. Judge Kahn's order is the law in the case. The trustee has already distributed funds to the Estate to satisfy its claim. Mrs. Broughton's objection is overruled. The Estate's claim is allowed as previously ordered.

4.   Applications for Compensation for Walter L. Hinson, attorney for the trustee and chapter 7 trustee

Mr. Hinson filed the chapter 7 trustee's final report on June 18, 2020 and filed his applications for compensation on the same date. [Docket Nos. 533, 534, and 536]. His applications seek attorney fees of $300,000.00 and trustee compensation of $75,744.78 and expenses of $179.65. Mrs. Broughton filed a response in opposition to the applications on July 13, 2020 and amended her response on July 14, 2020. [Docket Nos. 544 and 547]. The Bankruptcy Administrator filed a response to Mrs. Broughton's response in opposition on July 20, 2020. [Docket No. 552].

Mrs. Broughton's response in opposition to the trustee's applications again centers on her allegation that the trustee, attorneys involved in the case, and the judges assigned to the case engaged in a conspiracy to steal the Property. As a result of this alleged conspiracy, Mrs. Broughton argues that Mr. Hinson cannot be paid the requested fees. There are no arguments in her response in opposition regarding the reasonableness of the fees being requested by Mr. Hinson or any statements questioning whether the work detailed in the applications was actually performed by Mr. Hinson.

The Court will first consider the application for attorney fees. Mr. Hinson's employment as attorney for the trustee was approved on September 4, 2015. [Docket No. 206]. Mr. Hinson's request for compensation is made pursuant to 11 U.S.C. § 330, which allows

16

"reasonable compensation for actual, necessary services" rendered by a professional employed by the trustee. Mr. Hinson's application for attorney fees requests $300,000.00 for the period from July 15, 2015 through May 31, 2020. The application indicates that Mr. Hinson and his staff spent a total of 1,072.70 hours on Mrs. Broughton's case. Mr. Hinson's hourly rate ranged from $142.50 (which appears to be the rate for travel time) to $325.00 per hour, his paralegal and legal assistant's hourly rate ranged from $120.00 to $150.00 per hour, and his associate's hourly rate ranged from $235.00 to $265.00 per hour. The application also requests a small enhancement of attorney fees in the amount of 5.6%, or $15,934.75. The Bankruptcy Administrator's response states that she has carefully reviewed Mr. Hinson's request for attorney fees and states that "the fees requested are entirely reasonable and reflective of the excellent service performed by the attorney for trustee in this case" and that she supports the enhancement request.

Because Mrs. Broughton's objection does not question the reasonableness of the fees or whether the work was actually performed and because Mr. Hinson is an officer of the Court, the Court takes Mr. Hinson's application as prima facie evidence of the work performed and the reasonableness of the fees. Additionally, the docket sufficiently supports and demonstrates the actual work performed as counsel. In examining fee applications, the first step the Court should undertake is establishing the lodestar figure. The lodestar figure is the attorney's hourly rate multiplied by the number of hours expended. *See In re EBW Laser, Inc.*, 2012 WL 3490417, at *9 (Bankr. M.D.N.C. Aug. 14, 2012). In determining the lodestar figure, the Court should consider whether the rate and the number of hours are reasonable, through the application of the twelve factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) and adopted by the Fourth Circuit. *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir.

17

1978); *EBW Laser,* 2012 WL 3490417, at *9. Next, the Court should "determine whether there

are any exceptional circumstances which were not addressed in the court's twelve-factor analysis

which warrant any adjustment of the lodestar figure." *EBW Laser,* 2012 WL 3490417, at *9.

The *Johnson* factors are as follows:

> (1) the time and labor required; (2) the novelty and difficulty of the
> questions; (3) the skill requisite to properly perform the legal services; (4)
> the preclusion of other employment by the attorney due to acceptance of the
> case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7)
> time limitations imposed by the client or the circumstances of the
> engagement; (8) the amount involved and the results obtained; (9) the
> experience, reputation, and ability of the attorneys; (10) the "undesirability"
> of the case; (11) the nature and length of the professional relationship with
> the client; and (12) awards in similar cases.

*Id.*

Mr. Hinson's application indicates that the fees earned in this case are $284,065.25. A

consideration of the *Johnson* factors, discussed in further detail below, compels the conclusion

that the attorney fees being requested by Mr. Hinson are reasonable and that no adjustments to

the lodestar figure are necessary.

 *i.* *The Time and Labor Required*

This factor requires "an examination of the work performed and a determination of

whether the work performed is legal work and whether the amount of time spent in doing the

work is reasonable." *Id.* From a simple review of the docket in this matter, it is evident that this

case required Mr. Hinson and his staff to expend substantial time and labor. As the Court

detailed at the outset, the combined docket in this case has nearly 800 entries. Mrs. Broughton

filed objections to nearly every document filed by another party in the case—and sometimes

filed numerous amendments or supplements to those objections. Multiple adversary proceedings

and appeals were involved, each with its own docket. Mr. Hinson's marketing and selling

Property, usually a trustee duty, was made exponentially more difficult by Mrs. Broughton's continuous efforts to thwart the sale. It is likely that additional time was spent on Mrs. Broughton's case, but not captured.

### ii.    *The Novelty and Difficulty of the Questions Involved*

The legal issues involved in this case were not, by themselves, highly complex. However, matters were complicated by Mrs. Broughton's unusual and vexatious legal theories and litigation strategies. This presented Mr. Hinson with unique challenges to manage as he navigated Mrs. Broughton's case.

### iii.    *The Skill Requisite to Properly Perform the Legal Services*

The skill required for Mr. Hinson to properly perform his duties in this case was varied. As Mr. Hinson's application pointed out, this case required him to have a working knowledge of the United States Bankruptcy Code and certain other applicable United States Code sections, as well as state law. The case also required him to have knowledge and related skills to support the marketing and sale of the Property. Finally, responding to Mrs. Broughton's various arguments and documents required special skill and expertise.

### iv.    *The Preclusion of Other Employment*

As a result of the length of this case and the substantial amount of time required of Mr. Hinson throughout the case, Mr. Hinson was unable to take on additional clients or focus on other matters. Additionally, serving as the trustee's attorney in this case also prevented Mr. Hinson from representing any other party involved in the case.

### v.    *The Customary Fee*

This factor requires the Court to consider "the customary fee for similar work in the community. . . ." *EBW Laser*, 2012 WL 3490417 at *12 (alteration original) (quoting *Johnson*,

488 F.2d at 718). "In the Fourth Circuit the relevant market for determining the prevailing market rate ordinarily is the community in which the court making the determination sits." *Id.* (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994); *National Wildlife Fed'n v. Hansen*, 859 F.2d 313 (4th Cir. 1988)). Here, the hourly rates listed by Mr. Hinson for himself and his staff are within the range of standard rates for attorneys of similar experience and ability. In fact, the hourly rate being charged by Mr. Hinson is likely lower than others of his experience. Mr. Hinson's application indicates that attorneys of his comparable experience and skill in the Raleigh market would charge around $400 per hour, associate attorneys would typically charge $300 to $350 per hour, and paralegals would typically charge $175.00 per hour.

      *vi.*     *Whether the Fee is Fixed or Contingent*

The fees here are based on fixed hourly rates. Had the sale not been consummated, Mr. Hinson likely would never have been paid for the substantial time he expended in this case supporting the trustee's sales efforts and litigating the various issues.

      *vii.*    *Time Limitations*

Mr. Hinson's application indicates that during the period the case has been pending, he has frequently had to resolve matters on a time-limited basis. Indeed, Mr. Hinson was frequently required to respond or react quickly to matters in the case, especially given Mrs. Broughton's repeated efforts to impede the sale of the Property.

      *viii.*   *The Amount Involved and the Results Obtained*

The amount involved in this case was significant. The claims filed in Mrs. Broughton's case totaled $1,012,707.28. The Property was ultimately sold for $2,100,000.00. Mr. Hinson successfully negotiated a settlement with Bank of America, reducing its claim by over

20

$200,000.00, saving the estate a substantial sum of money.  As a result, all creditors were paid in full, and after administrative claims are also paid, Mrs. Broughton will receive a surplus in excess of $315,000.00, in addition to the $35,000.00 she has already received for her exemption.

ix.     *The Experience, Reputation and Ability of the Attorneys*

Mr. Hinson's application indicates that he has been practicing in North Carolina state and bankruptcy courts since 1973.  The application states that he has been appointed in over 11,500 cases from January 2010 to the present.  Mrs. Pierce, his associate attorney, also has substantial bankruptcy experience, having practiced law since 2003.  It is clear from the results in the case and the comments made at the August 5 hearing by the Bankruptcy Administrator and other attorneys involved in the case that Mr. Hinson is highly regarded and capable.

x.     *The "Undesirability" of the Case*

The difficulty of this case is clear from the record.  In addition to the extremely litigious nature of Mrs. Broughton, her propensity to contest any and all happenings in the case, and her extensive efforts to interfere with Mr. Hinson's marketing and sale of the Property, Mrs. Broughton has continuously engaged in personal attacks on Mr. Hinson and his character, accusing him of fraud and criminal conspiracy and maintaining that he should be imprisoned. This case was clearly difficult.

xi.     *The Nature and Length of the Professional Relationship*

Mr. Hinson was serving as both the chapter 7 trustee and the attorney for the trustee in this case; accordingly, nothing further need be said about this factor.

xii.     *Awards in Similar Cases*

As discussed in connection with the previous factors, the hourly rates charged by Mr. Hinson and his staff are reasonable, as are the number of hours for which Mr. Hinson seeks

compensation. As the Court previously noted, if anything, both of these numbers could be higher and still meet the threshold for reasonableness.

Based on these factors, no adjustment to the lodestar figure is necessary. Having found that no adjustment is necessary, the Court then turns to the next step in the analysis, whether there are any exceptional circumstances that warrant adjustment. Here, the length of the case, the time involved, the difficulties presented by Mrs. Broughton's litigious nature, and the exceptional results achieved, the Court finds that an enhancement of the fees requested is appropriate. The Court grants Mr. Hinson's request for a 5.6% enhancement, or an additional $15,934.75. Mr. Hinson's application for attorney fees in the total amount of $300,000.00 is approved.

Mr. Hinson has also filed an application for chapter 7 trustee commission and reimbursement of expenses. That application seeks commission of $75,744.78 and expenses of $179.65.[3] Mrs. Broughton's objection to Mr. Hinson's applications does not state specific objections to the trustee's request for commission. The trustee's request for commission is made pursuant to 11 U.S.C. § 326(a). That section provides:

> In a case under chapter 7 or 11, other than a case under subchapter V of chapter 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

Section 330(a)(7) provides, "In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section

---

[3] The trustee was previously reimbursed for expenses in the amount of $8,654.02. [Docket No. 509].

326." The Fourth Circuit has interpreted this section to require that generally, the fee for chapter 7 trustees is a commission, to be calculated pursuant to the formula set for in section 326, and only to be adjusted when extraordinary circumstances exist. *In re Rowe*, 750 F.3d 392, 397 (4th Cir. 2014). Extraordinary circumstances include "not performing trustee duties [or] performing them negligently or inadequately" and only arise in "rare and unusual circumstances" in situations "where the trustee's case administration falls below acceptable standards or where it appears a trustee has delegated a substantial portion of his or her duties to an attorney or other professional." *Id.*

Here, the Court has found that Mr. Hinson faithfully and competently performed his duties. As discussed throughout this order, Mr. Hinson patiently dealt with Mrs. Broughton and her various tactics and personal attacks on him, negotiated a settlement that resulted in substantial savings to the estate, and marketed and sold the Property for a sum sufficient to pay all creditors and provide Mrs. Broughton with a significant surplus. No extraordinary circumstances exist here justifying any reduction of Mr. Hinson's commission.

Mr. Hinson recovered a total of $2,100,000.00 for the estate. Excluded from the calculation of his commission is the amount paid to Mrs. Broughton for her exemption, $35,000.00, and the surplus paid to Mrs. Broughton in the amount of $315,173.86. This leaves $1,749,826.14 upon which the trustee commission can be calculated. Using the formula set forth in § 326(a), the amount of commission to which Mr. Hinson is entitled is $75,744.78. Further, Mr. Hinson is entitled to reimbursement of his expenses, as set forth in his application, in the total amount of $179.65 pursuant to § 330(a)(1)(B). Mr. Hinson's application for compensation is approved.

23

At the August 5 hearing, Mrs. Broughton made a variety of arguments as to why Mr.

Hinson's applications should not be approved. Mrs. Broughton stated that the overarching issue

was whether Mr. Hinson betrayed his trust as trustee in her case and thereafter fraudulently

signed the bankruptcy surety bond, swearing that he had never violated bankruptcy or other laws.

She then purported to present evidence in support of her contention that Mr. Hinson "constantly"

violated bankruptcy laws in her case.

Mrs. Broughton raised issues concerning Mr. Hinson's bond. She stated that the bond

was fraudulently signed and testified that Mr. Hinson did not perform the duties required of a

chapter 7 trustee. She complained that she had never received a copy of the bond despite

numerous requests, and stated that the Bankruptcy Administrator had finally given her a

purported copy the morning of the hearing, but suggested that she did not believe it was a true

and accurate copy of the actual bond.

11 U.S.C. § 322 sets forth the requirement for a trustee to obtain a bond and states, in

relevant part:

> (a) Except as provided in subsection (b)(1), a person selected under section
> 701, 702, 703, 1104, 1163, 1183, 1202, or 1302 of this title to serve as trustee in a
> case under this title qualifies if before seven days after such selection, and before
> beginning official duties, such person has filed with the court a bond in favor of
> the United States conditioned on the faithful performance of such official duties.

"The purpose of the [trustee's] bond is to assure faithful performance by the trustee and to

indemnify the estate for any loss that might be sustained as a result of the misfeasance or

malfeasance of the trustee." *R. Woolsey & Assocs., Inc. v. Gugino (In re R. Woolsey & Assocs.,

Inc.)*, 454 B.R. 782, 785-86 (Bankr. D. Idaho 2011). First, the Bankruptcy Administrator

represented that she did provide a copy of the bond to Mrs. Broughton; thus, Mrs. Broughton has

not been deprived of a copy of the bond. Further, despite Mrs. Broughton's arguments to the

contrary, the record in this case is abundantly clear that Mr. Hinson has competently and faithfully performed his duties as a chapter 7 trustee. This order contains numerous examples and extensive discussion of Mr. Hinson's faithful execution of his duties. The Court finds no issue with the trustee's performance of his duties.

Mrs. Broughton argued that Mr. Hinson did not have authority to sell the Property because it is fully exempt as a domestic support obligation under the Bankruptcy Code and cannot be part of the bankruptcy estate. This is an incorrect characterization of the law. The Bankruptcy Code does not contain any provision indicating that property acquired using a domestic support obligation or received in domestic litigation is exempt. The Bankruptcy Code does contain provisions stating that certain types of domestic support obligations or obligations incurred in connection with a divorce are not dischargeable. *See* 11 U.S.C. § 523(a)(5), (a)(15). However, these have no impact on the exemptions that a debtor can claim in any property received as a result of a divorce settlement or another's obligation to pay domestic support to the debtor. Further, Judge Aron previously held that Mrs. Broughton's exemption in the Property is limited to $35,000.00. [Docket No. 238]. Mrs. Broughton did not appeal that order. She later attempted to amend her exemption claim to exempt all of her real and personal property. [Docket No. 294]. However, Judge Aron denied that request. [Docket No. 391]. Mrs. Broughton tried to amend her exemption a second time, again seeking to exempt 100% of her real property. [District Court Case No. 5:16-cv-00302-S, Docket No. 517]. Judge Reidinger denied that request. [District Court Case No. 5:16-cv-00302-S, Docket No. 539]. Mrs. Broughton then filed an objection to Judge Reidinger's order, which Judge Reidinger construed as a motion to reconsider, and denied. [District Court Case No. 5:16-cv-00302-S, Docket No. 549]. Mrs. Broughton then filed a motion for leave to appeal on October 15, 2018. [District

Court Case No. 5:16-cv-00302-S, Docket No. 551]. Judge Reidinger denied that motion on November 19, 2018. [District Court Case No. 5:16-cv-00302-S, Docket No. 561]. Mrs. Broughton appealed Judge Reidinger's denial of her motion for leave to appeal on November 27, 2018. [District Court Case No. 5:16-cv-00302-S, Docket No. 565]. On July 5, 2019, the Fourth Circuit Court of Appeals issued an order dismissing the appeal for lack of jurisdiction, because the order Mrs. Broughton sought to appeal was neither a final order nor an appealable interlocutory or collateral order. [Appellate Case No. 18-2427, Docket No. 40]. Nothing further was filed regarding Mrs. Broughton's exemption claim. Accordingly, Judge Aron's order finding that Mrs. Broughton's exemption in the Property was limited to $35,000.00 is the law in the case.

Mrs. Broughton next argues that after Mr. Aldridge, counsel for Wells Fargo, filed Wells Fargo's "fabricated" claim in her bankruptcy case, Mr. Aldridge and Mr. Hinson became "bosom buddies" and Mr. Hinson acted at the direction of Wells Fargo, administering the estate solely for Wells Fargo's benefit. There is no evidence of this. First, as discussed above, the claim of the Estate, filed by Wells Fargo, as the co-executor of the estate, has been found valid and allowed in this case. Second, as discussed above, Mr. Hinson's administration of the estate has resulted in all creditors being paid in full and Mrs. Broughton receiving a substantial surplus. Thus, it is clear that the estate was not administered solely for Wells Fargo's benefit.

Mrs. Broughton's next argument is that Mr. Hinson and Judge Reidinger conspired to steal her Property without authority. This argument is not new. Mrs. Broughton has made this argument repeatedly, beginning shortly after Judge Reidinger was assigned to the case. This Court has previously considered this argument. On July 16, 2019, the Court issued an order inviting Mrs. Broughton to present evidence to support her "Request for Recognition of the Void

Ab Initio Status of October 2, 2018 Order," in which she made the same argument. [Docket No.

453]. Despite this invitation, Mrs. Broughton failed to produce even a scintilla of evidence

supporting her assertion of a conspiracy. The Court entered an order denying her request for a

hearing on the "Request for Recognition of the Void Ab Initio Status of October 2, 2018 Order"

on September 4, 2019, stating:

> [T]here is no evidence that any fraud has occurred in connection with Mrs.
> Broughton's bankruptcy case and the sale of the Property. Despite the Court's July
> 16 order requesting additional information, Mrs. Broughton has submitted no
> evidence to the Court to support her claims of fraud. The only thing that Mrs.
> Broughton has produced in support of her claims of fraud are her statements that
> the trustee and Judge Reidinger engaged in fraud. These unsupported assertions
> are wholly insufficient to establish fraud. *See Henderson v. U.S. Dep't of Labor*,
> C/A No. 6:06-cv-00009, 2008 WL 191302 (W.D. Va. Jan. 23, 2008) ("Plaintiff's
> Motion is supported primarily by unsubstantiated allegations of false statements
> made by Assistant United States Attorney. . . . Unsupported allegations of this sort
> are insufficient to prove fraud on the court."); *Sylvester v. Stone (In re Stone)*, 11
> B.R. 209, 211 (Bankr. D.S.C. 1981) ("Fraud is never presumed. It has always been
> fundamental that the conduct of mankind is presumed to be upright and those who
> allege to the contrary have the burden of strict proof as to every essential
> allegation."). Despite the additional opportunity to support her statements with any
> actual evidence, even after failed motions to reconsider, redundant requests, and
> appeals, Mrs. Broughton has produced no evidence whatsoever that her highly
> inflammatory statements are grounded in fact.

[Docket No. 470]. Accordingly, the Court denied Mrs. Broughton's Request for Recognition of

the Void Ab Initio Status of October 2, 2018 Order. Mrs. Broughton did not appeal that order.

Despite the previous findings regarding Mrs. Broughton's allegations, at the August 5

hearing, the Court again gave Mrs. Broughton the opportunity to present evidence regarding the

alleged conspiracy. Yet, once again, she made only broad, vague statements that a conspiracy

between Judge Reidinger and Mr. Hinson occurred. No evidence was presented. As the Court

repeatedly told Mrs. Broughton at the August 5 hearing, her saying so does not make it so.

There has been no evidence presented regarding a conspiracy between Mr. Hinson and Judge

Reidinger to steal Mrs. Broughton's Property, and that contention has already been rejected, just as the Court now, once again, rejects it.

Mrs. Broughton also argued that Mr. Hinson's conduct violated one of the principal purposes of bankruptcy, to provide the debtor with a fresh start. While the "fresh start" is indeed one of the purposes of bankruptcy, it is not the only purpose. Paying creditors, where possible, is also a primary purpose of bankruptcy. *See In re Goldsberry*, 142 B.R. 158, 158 (Bankr. E.D. Ky. 1992). *See also Moses v. CashCall, Inc.*, 781 F.3d 63, 72 (4th Cir. 2015) ("[A] principal purpose of the Bankruptcy Code is to provide debtors and creditors with 'the prompt and effectual administration and settlement of the [debtor's] estate.'") (alteration original). This purpose was satisfied here. As set forth above, all creditors are being paid in full. Additionally, Mrs. Broughton is in fact getting a fresh start as a result of her bankruptcy case. Her debts have been paid in full, and she is receiving a substantial surplus, in addition to her exemption. The primary purposes of bankruptcy have been fulfilled in this case.

Mrs. Broughton asserted that Mr. Hinson's misconduct is further shown by his ex parte communications with the United States Marshal. There is no statute or rule prohibiting a chapter 7 trustee's direct communications with the United States Marshal Service. Any communications Mr. Hinson may have had with the United States Marshal were not inappropriate or prohibited.

Mrs. Broughton argued that Mr. Hinson fraudulently represented to the United States Marshal that she was interfering with his efforts to sell the Property and that he slandered her in his communications to the United States Marshal, which "set her up to be mistreated by that law enforcement agency." The record in this case is replete with evidence that Mrs. Broughton did in fact, on repeated occasions interfere with Mr. Hinson's efforts to sell the Property. Mr. Hinson was forced to file a motion requesting an order directing the debtor to cooperate with the trustee

28

and an order requiring the debtor to vacate the Property, due to the debtor's refusal to cooperate. [District Court Case No. 5:16-cv-00302-S, Docket No. 499]. Judge Reidinger entered an order granting that motion on October 2, 2018. [Docket No. 547]. Mrs. Broughton refused to comply and the United States Marshal was ordered to seize the Property. [District Court Case No. 5:16-cv-00302-S, Docket No. 582]. Even after this, Mrs. Broughton refused to remain away from the Property and on several occasions returned to and continued to reside in the Property. On June 21, 2019, this Court held a hearing on request of Mr. Hinson and the Bankruptcy Administrator, who asserted continuing noncompliance by Mrs. Broughton. At the hearing, a Raleigh police officer testified that he had been called to the Property on three occasions and that on each occasion, Mrs. Broughton was present at the house, even inviting the officer into the home on one such occasion. [Docket No. 444]. On that occasion, Mrs. Broughton was charged with breaking and entering after she refused to leave the Property. The Court held Mrs. Broughton in civil contempt for her knowing and willful noncompliance with the Court's orders. [Docket No. 444]. Mrs. Broughton purged this finding of contempt by signing an agreement to cooperate with the trustee and to not return to the Property. [Docket No. 438].

Subsequently, on August 14, 2019, the Bankruptcy Administrator filed a further notice asserting that Mrs. Broughton had violated orders of the Court and her agreement to cooperate with Mr. Hinson by "(1) sending a letter to the purchaser's counsel stating that the purchaser could not obtain valid title to the Property; (2) posting signs on the Property, including on the front gate, indicating that the Property is not for sale and that trespassers will be prosecuted; and (3) leaving a voicemail for the purchaser's counsel stating that she had posted the no trespassing sign on the Property and that she would 'take a no trespassing charge' against any person who entered on the Property." [Docket No. 466]. As a result of Mrs. Broughton's continued refusal

29

to comply, the undersigned was ultimately forced to order the incarceration of Mrs. Broughton until she purged herself of contempt or until the sale of the Property was completed. [Docket No. 466].

Mrs. Broughton also repeated her argument, made numerous times throughout the case, that Judge Reidinger fabricated a transcript of a hearing held in her case. She has made this argument numerous times during her case, yet has presented no evidence to support this claim. Mrs. Broughton first made this argument in October of 2018, alleging that the transcript of an August 10, 2018 hearing on various matters was fabricated. [District Court Case No. 5:16-cv-00302-S, Docket No. 557]. She also made two requests for production of the electronic recording of the hearing, which requests were denied by Judge Reidinger. [District Court Case No. 5:16-cv-00302-S, Docket Nos. 562 and 594]. Judge Reidinger noted that he had "no reason to question the competence or integrity of the court reporter who prepared the transcript." [District Court Case No. 5:16-cv-00302-S, Docket No. 562]. Mrs. Broughton's appeal to the Fourth Circuit regarding this issue was unsuccessful. [Appellate Case No. 18-2427, Docket No. 14]. Judge Reidinger again stated that the transcript was valid in an order he entered on February 25, 2019. [District Court Case No. 5:16-cv-00302-S, Docket No. 591]. And, this Court detailed this history of Mrs. Broughton's many chances to present evidence and her failure to do so in two of its previous orders. [Docket No. 453, 469, 470].

In addition to Mrs. Broughton's arguments regarding the Property, Mrs. Broughton also argued that her personal property, located within the residence, was stolen from her. However, the order entered on October 2, 2018, which required Mrs. Broughton to vacate the Property gave Mrs. Broughton sixty (60) days to vacate the Property. [District Court Case No. 5:16-cv-00302-S, Docket No. 547]. This gave her ample time to remove any personal property she

30

wished to retain from the Property; however, she failed to do so. The order provides that "any personal property remaining on the property after the turnover date shall be deemed abandoned and therefore may be disposed of by the ultimate purchaser of the property or by the Trustee in a manner deemed appropriate and expeditious." [District Court Case No. 5:16-cv-00302-S, Docket No. 547]. That order is the law in the case. [Appellate Case No. 18-2427, Docket No. 40]. Mrs. Broughton's personal property was not stolen. By her failure to remove it from the Property, she abandoned it.

Mrs. Broughton claims that Mr. Hinson improperly failed to serve her with various documents in the case in an effort to prevent her from appealing orders of the Court and to keep her from being informed about the status of the case. First, many of the documents in the case that she has claimed she did not receive are orders, which the Court mailed to her. Further, Mrs. Broughton has not pointed to a single order in the case that is not accompanied by a certificate of service reflecting service on her by the Court. With respect to pleadings filed by Mr. Hinson, the record also reflects certificates of service filed by him indicating that he served those documents on Mrs. Broughton. Again, Mrs. Broughton has not pointed to any pleading filed by Mr. Hinson that does not contain a certificate of service. She claimed at the August 5 hearing that although Mr. Hinson filed a certificate of service saying that he served her, he did not actually "follow through with getting them to [her]." She introduced no evidence regarding this, other than her statement. Additionally, Mr. Hinson's obligation to serve documents does not require him to ensure that the document is actually received by all those on whom he serves the document. *See* Fed. R. Bankr. P. 7004(b); 9014.

Mrs. Broughton also complains of the settlement entered into by Mr. Hinson with Bank of America. She claims that she had no knowledge of it and suggested that Mr. Hinson's

31

purpose in negotiating that settlement was to increase his fees. She stated that he "concocted" the settlement and spent months finalizing it, "irritating the . . . creditors [and] worrying them to death." In actuality, the settlement of which she complains, the settlement of Adversary Proceeding Number 5:16-cv-00958-RE, reduced the claim of Bank of America from $240,028.25 to $20,000.00, resulting in a substantial savings to the estate and the availability of a surplus to be paid to Mrs. Broughton. Thus, the settlement actually benefited other creditors and Mrs. Broughton.

Mrs. Broughton asserts that all of the criminal actions she alleges occurred in this case were violations of 18 U.S.C. § 1519 and North Carolina criminal law. Section 1519 states:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

First, many of the actions of which Mrs. Broughton complains do not conceivably fall under this section. Additionally, as the Court has repeatedly stated, Mrs. Broughton has not, despite numerous opportunities and invitations to do so, presented any evidence in support of her claims of criminal actions by participants in this case. Thus, she has not established any violations of either 18 U.S.C. § 1519 or any North Carolina statute.

Finally, with respect to an overarching issue in this bankruptcy case, Mrs. Broughton misconstrues how the disposition of her Property transpired. Her professed belief, based on her arguments, is that Judge Reidinger and Mr. Hinson conspired to steal the Property from her, that the Property was conveyed to the Court or the trustee and was sold for the personal gain of Mr. Hinson and Judge Reidinger. This is not how bankruptcy works. As the Court has stated in previous orders, when Mrs. Broughton filed her bankruptcy case she submitted herself and all of

32

her property to the jurisdiction of this Court. [Docket No. 444, 470]. When the bankruptcy case was filed, an estate was created of all of Mrs. Broughton's interests in property, including the Property. Despite Mrs. Broughton's attempt to create a trust, the Court previously found that full equitable and legal title to the Property remained with Mrs. Broughton; therefore, the Property was property of the estate. When Mrs. Broughton's case was converted to chapter 7, Mr. Hinson was appointed as the chapter 7 trustee. 11 U.S.C. § 704 provides that one of the chapter 7 trustee's principal duties is to liquidate property of the estate and distribute proceeds as provided in the Bankruptcy Code. 11 U.S.C. § 363 allows trustees to sell property. Neither the Court nor Mr. Hinson ever took "ownership" of the Property. Instead, the Property became property of the estate and Mr. Hinson, in performing his duties as a chapter 7 trustee, marketed and sold the Property, a bankruptcy estate asset, to pay Mrs. Broughton's creditors. This sale was not for the personal gain of any of the judges or Mr. Hinson. It was for the benefit of creditors, and, as a result of the surplus she is to receive, Mrs. Broughton. The sale of the Property was not the result of a conspiracy or any party's attempt to profit from "stealing" Mrs. Broughton's property. It was simply the usual, customary result of a voluntary chapter 7 bankruptcy case. The sale of the Property was valid and has been completed. Mrs. Broughton is no longer the owner of the Property. Mrs. Broughton's misapprehension of or refusal to accept the law, repeatedly made clear and followed by the judges in this case, refutes the claims of fraud, and her contentions are not credible. Mrs. Broughton's numerous arguments are without merit. The trustee faithfully and fully performed his duties as trustee. There have been no losses as a result of misfeasance or malfeasance. The trustee's applications for compensation are approved.

## **CONCLUSION**

The administration of this case is complete.  The Clerk's office may close the case in the ordinary course.  However, the terms of the Court's order imposing a pre-filing injunction, entered on August 30, 2019, remain in effect.  [Docket No. 466]. Additionally, the Clerk's office is directed not to accept for filing any documents, papers, or other pleading received from Mrs. Broughton in the main case, in any adversary proceeding, or in any miscellaneous proceeding, except for a notice of appeal or any other document required by the 8000 series of the Federal Rules of Bankruptcy Procedure governing appeals, unless Mrs. Broughton has sought and obtained prior authorization for the filing from a bankruptcy judge in the Eastern District of North Carolina or the undersigned.

AND IT IS SO ORDERED.

The Honorable David R. Duncan
United States Bankruptcy Judge
Eastern District of North Carolina

August 31 , 2020